UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 10-20042 |
| DUANE L. O'MALLEY, | ) |
| Defendant. | ) |

# ORDER AND OPINION

Now before the Court are Defendant O'Malley's Motion for New Trial (Doc. 209) and Motion for New Trial and Evidentiary Hearing (Doc. 304). For the reasons set forth below, Defendant's Motion for New Trial (Doc. 209) is DENIED, Defendant's Motion for New Trial and Evidentiary Hearing (Doc. 304) is DENIED, and all other pending motions are DENIED AS MOOT.

## BACKGROUND

*A. Factual Background*

The following facts are culled from the record in O'Malley's criminal case, as well as the opinions in *United States v. O'Malley*, 739 F.3d 1001 (7th Cir. 2014), and *United States v. O'Malley*, 833 F.3d 810 (7th Cir. 2016). In 2005, real estate developer Michael Pinski purchased a building in Kankakee, Illinois. Pinski had an asbestos survey prepared prior to the purchase, so he knew that the building contained about 2,200 linear feet of asbestos-containing pipe insulation. In 2009, Pinski hired Duane "Butch" O'Malley and his company, Origin Fire Protection ("Origin"), to correct certain code violations by converting the sprinkler system in the building from a wet system to a dry system. *O'Malley*, 739 F.3d at 1003.

During a tour of the building, O'Malley pointed to the insulation on the pipes and offered to remove it for an additional fee. After Pinski informed O'Malley that the insulation on the pipes contained asbestos, O'Malley persuaded Pinski to hire him for the work by telling Pinski that he would properly remove and dispose of the insulation for the bargain price of $12,000. Unlike the contract for the installation of the sprinkler system, the terms of the insulation removal agreement were never reduced to writing and O'Malley insisted that Pinski pay for the insulation removal work in cash. When O'Malley walked through the building with one of his employees, James Mikrut, Mikrut told him that "[t]his is probably all asbestos in this building." O'Malley later told Mikrut that he requested cash payments from Pinski so "there wouldn't [be] a paper trail." Neither O'Malley nor Origin possessed a license to remove asbestos, and none of Origin's employees were trained in complying with federal asbestos removal regulations. *Id*.

O'Malley offered to pay Origin employee Virgil Lietz to help remove the insulation from the building and informed him that it may contain asbestos, but Lietz declined the offer after he was warned by Mikrut to avoid asbestos work. O'Malley also considered Richard Folk for the job. Folk told O'Malley that asbestos removal required a license that he did not possess, but nevertheless offered to do the work for $10,000. *Id*. (see also, Doc. 85, at 140).

O'Malley eventually found a lower bid. Jeff Franc agreed to remove the asbestos for $4,000. Franc recruited three other workers to help out, and in August 2009, the crew stripped dry asbestos insulation off of the pipes using materials—a circular saw, paint suits, simple dusk masks, and respirators with missing filters—provided by O'Malley. Because the insulation was not properly wetted, the circular saw produced large amounts of dust that quickly clogged the workers' masks. After a day or two of inhaling the dust, Franc's crew stopped working and complained that the dust made them sick. *Id*. at 1004.

2

The insulation was discarded into over 100 plastic garbage bags and loaded into an Origin dump truck. At first, O'Malley asked Origin employee Steven Giles to transport the bags of asbestos insulation to Angel Abatement, an asbestos abatement company. When Angel Abatement refused to accept the load, O'Malley had Franc take some of the bags to dump at an abandoned farmhouse by O'Malley's property. He also had Lietz dispose of some of the bags, which ended up in a dumpster near a Hobby Lobby store. O'Malley asked Franc and Mikrut to get rid of the remaining bags, and the two drove the dump truck to a field in Hopkins Park, Illinois, and left the bags near a vacant house at the end of a road. *Id*.

In September 2009, Illinois Environmental Protection Agency ("IEPA") Director Joseph Kotas inspected the building and the field where the bags were dumped. At the field, Kotas observed open and torn bags with insulation spilling out onto the ground. The material was tested and determined to be regulated, friable asbestos with concentrations of asbestos between 8% and 48%. EPA Superfund contractors ultimately expended more than $47,000 to properly remove and dispose of the bags of asbestos and to clean up the contaminated soil. *Id*.

O'Malley told Mikrut to deny removing the insulation and say he only did alarm work if asked by Kotas. Mikrut falsely claimed to Kotas that they did not take any insulation off the pipes. Doc. 85, at 57–58. However, when he was interviewed by the federal EPA's criminal investigation division, Mikrut admitted that they had removed and dumped asbestos insulation and agreed to make recorded calls to O'Malley. In those calls, O'Malley is heard coaching Mikrut to mislead the federal EPA agents about the asbestos. When O'Malley was confronted by the agents, he admitted in oral and written statements that he failed to stop the illegal asbestos removal even after he suspected the material was asbestos. *Id*.

*B. Procedural Background*

In June 2010, O'Malley, Mikrut, and Pinski were indicted by a grand jury with five counts of knowingly violating the criminal provisions of the Clean Air Act by improperly removing and disposing of insulation containing regulated asbestos.[1] Pinski and Mikrut pleaded guilty and testified against O'Malley at his jury trial, which took place from September 21 to September 26, 2011. At trial, Pinski, Mikrut, Folk, Lietz, Franc, James Schultz, and EPA Special Agents Williams Oros and Matthew Siler testified to O'Malley's knowledge that the insulation in the building contained asbestos. See generally Docs. 85, 86. The jury found O'Malley guilty of all five counts of the indictment. Doc. 68. After the jury returned its verdict, O'Malley, then assisted by counsel, filed his first motion for new trial (Doc. 71), which was denied on November 7, 2011. Doc. 75. In April 2012, Pinski was one of many witnesses who testified for the Government in *United States v. Jimmy LaCost*, No. 10-20001 (C.D. Ill. 2012), who was later convicted of money laundering and structuring charges.

At the July 2012 sentencing, Judge McCuskey sentenced O'Malley to an aggregate term of 120 months' imprisonment, $47,085.70 in restitution, a $15,000 fine, and a $500 special assessment. Doc. 121. O'Malley appealed, arguing primarily that the Government was required to prove that he knew the asbestos in the building was one of the six forms of regulated asbestos, and that the Government failed to meet this burden. The Seventh Circuit disagreed, "concluding that asbestos is so dangerous and the probability of regulation is so great that anyone working with the material would be presumed to know the applicable regulations." *United States v. O'Malley*, 833 F.3d 810, 811 (7th Cir. 2016) (citing *O'Malley*, 739 F.3d at 1007).

---

[1] See 42 U.S.C. 7413(c)(1).

In February 2013, while his direct appeal remained pending, O'Malley filed a pro se motion for new trial based on what he alleged was newly discovered evidence. Doc. 172. After the Government filed a response to the motion (Doc. 182), O'Malley filed numerous documents and exhibits supplementing his motion. Docs. 183, 185, 186, 188, 190. On June 19, Judge McCuskey entered an order informing O'Malley that unless he withdrew his motion, it would be construed as a motion under 28 U.S.C. § 2255. Doc. 196. O'Malley complied. Doc. 197. On March 31, 2014, two months after his direct appeal was decided, O'Malley filed his third motion for new trial (Doc. 209), and the Government responded. Doc. 212.

In his motion, O'Malley alleged that he had obtained new evidence that discredited Pinski, who was critical to establishing that O'Malley knew the insulation was asbestos. He grouped the new evidence into three categories: "(1) information withheld from him at the time of trial about Pinski's ongoing cooperation with federal authorities investigating Pinski's involvement in organized crime; (2) correspondence and agreements between Pinski and the Illinois EPA, which, O'Malley says, demonstrate that Pinski steered him to violate the Clean Air Act unintentionally; and (3) an appraisal of Pinski's property done after the asbestos removal that, O'Malley asserts, contradicts Pinski's trial testimony." *O'Malley*, 833 F.3d at 812. On May 28, 2014, the Court entered an order addressing O'Malley's claims. First, the Court denied O'Malley's third claim, finding that evidence of the appraisal would have been merely impeaching or cumulative, and thus not likely to lead to an acquittal. The court did not address the merits of O'Malley's first or second claims, reasoning that he "was relegated to raising both in a motion to vacate his sentence under § 2255 rather than a motion under Rule 33." *Id*.

O'Malley appealed. The Seventh Circuit agreed with O'Malley and "clarif[ied] that a motion for a new trial based on newly discovered evidence that demonstrates constitutional or

5

statutory error may indeed be brought under Rule 33 and should be granted 'if the interest of justice so requires.' " *Id*. at 815 (citing Fed. R. Crim. P. 33(a)). Therefore, because this Court "required O'Malley to bring pieces of his evidence in a separate action," the Seventh Circuit vacated the ruling and "direct[ed] the district court to allow [O'Malley] to proceed under Rule 33." *Id*.

Upon issuance of the mandate, the undersigned reopened O'Malley's motion for new trial, allowed him to supplement his motion, and set a briefing schedule. See Oct. 6, 2016 Text Order, October 21, 2016 Minute Entry. However, the October 21, 2016 Minute Entry incorrectly referred to O'Malley's second motion for new trial (Doc. 172), rather than his third (Doc. 209), which was the subject of his successful appeal.

Chaos ensued. O'Malley took the Seventh Circuit's decision and this Court's order allowing him to supplement his motion as an open invitation to relitigate issues far outside the scope of the two remaining claims in his third motion for new trial (Doc. 209) following the remand. After issuance of the mandate, O'Malley filed the following: Expedited Motion to Show Cause Prior to Proceeding Under Rule 33 (Doc. 262); Motion for Order to Show Cause why the Court Should not Grant a New Trial in the Interest of Justice (Doc. 263); Motion to Preserve all Records, Files, Investigation Reports, and any/all Cooperation Agreements Regarding the Above Captioned Matter … (Doc. 264); Supplemental Rule 33 Pleading Recognizing Structural Error, per se (Doc. 265); Motion for Appointment of Special Prosecutor and/or Notice to AUSA Miller for Criminal Contempt (Doc. 266); Motion for Post-Trial Discovery (Doc. 267); Motion Seeking Release of Petitioner Pursuant to Title 18 Sections 3143 and 3145(c) (Doc. 268); Motion for Extension of Time to File Supplemental Brief (Doc. 270); Motion for Extension of Time to File Supplemental Brief to Rule 33 Motion (Doc. 271); Emergency Motion so as to Allow Proper

Proceedings Moving Forward (Doc. 272); Expedited Motion for Unredacted Copies (Doc. 273); Motion to Compel Retained Rule 33 Attorneys Arthur Inman and Lisa Wood to Enter Their Limited Appearance in the Instant Matter for Cause Shown (Doc. 274); Defendant's Third Motion for Extension of Time to File (Doc. 275); and Motion to Enjoin Arthur Inman and U.S. EPA Suspension (Doc. 276).

On January 3, 2017, the Court entered a text order granting O'Malley's third request for an extension of time, explaining that

> the Court allowed Defendant to supplement his Rule 33 Motion and directed him to submit a single filing consolidating all the grounds for relief sought in his prior filings (Docs. 172, 183, 185, 186, 188, 190, 265) within 21 days. Thereafter, Defendant filed two Motions (Docs. 270, 271) for extensions of time to file his supplement, which the Court granted. Defendant has also filed 6 other motions seeking to compel, enjoin, requesting discovery, and requesting release. The Court will not consider those motions until Defendant submits his Supplemental Rule 33 Motion and the Government responds.

Jan. 3, 2017 Text Order. O'Malley then filed Defendant's Fourth Motion for Extension of Time to File (Doc. 277). On January 17, 2017, the Court denied O'Malley's request, reasoning that O'Malley had used the previous extensions of time, about 90 days, to file everything but the supplement, which was "simply to consolidate all the addenda to his Rule 33 Motion into one document." Jan 17, 2017 Text Order. Therefore, the Court ordered the Government "to respond to Defendants Rule 33 Motion (Doc. 172) and supporting Addenda (Docs. 183, 185, 186, 188, 190, 265) within 21 days of this Order." *Id*. Again, the Court erroneously referred to O'Malley's second motion for new trial (Doc. 172), rather than his third (Doc. 209).

Two weeks after the Court denied O'Malley's fourth request to extend the deadline to file his supplement, O'Malley filed the following: Motion for Leave to File Belated Consolidated Rule 33 Motion and Request to Extend Time to Add Necessary Documents (Doc. 278); Defendant's Supplement to his pre-Appeal Ruling Rule 33(b)(1) Motion for New Trial Under

7

#172, 183, 185, 186, 188, 190, and 265 to be Considered in Concert with #209 and #218 (Doc. 279); Book #4 Rule 33 Approved 10-21-16 Supplement to Consolidate Grounds to #172 et al. (Doc. 280); Book #1 Rule 33 #172 et al. 1-28-13 to 2-11-14 (Beginning through tab 10) (Doc. 281); Book #2 Rule 33 #209 et al. 3-31-14 to 5-27-15 (Doc. 282); Book #3 Rule 33 Supplement to #265 et al. 6-26-16 to 1-17-17 (Doc. 283); and Book #5 Affidavit and Partial Exhibits (Doc. 284). The Court ordered the Government to respond to O'Malley's request for leave to file, it objected (Doc. 285), and the Court denied the motion. Feb. 8, 2017 Text Order. O'Malley moved for certification of an interlocutory appeal. Doc. 286. Thereafter, the Government filed its response to the motion for new trial (Doc. 287), O'Malley moved for appointment of counsel (Doc. 290), the Court denied certification for an interlocutory appeal (Doc. 291), and the Seventh Circuit did the same (Doc. 292).

On March 13, 2017, the Court entered a written order granting O'Malley's request for counsel. Doc. 294. In that order, the Court first set forth the relevant procedural history of the case:

> While his direct appeal was pending, O'Malley filed a *pro se* motion for a new trial based on newly discovered evidence under Fed. R. Crim. P. 33. Doc. 172. His motion was based on three allegations: (1) the United States bribed codefendant Pinski by secretly agreeing that Pinski would not be liable for the $47,000 restitution to the EPA superfund, in violation of 18 U.S.C. § 201(c)(2); (2) the United States withheld information regarding Pinski's testimony in a subsequent trial; and (3) the United States "underhandedly worked in collusion with O'Malley's retained appellate counsel Roger Heaton to prevent disclosure of the prosecutorial misconduct address in 'Claims One and Two.'" Doc. 172, at 10-15. On April 3, 2013, O'Malley supplemented his motion to add a fourth allegation that the United States failed to disclose Pinski's involvement in the state civil proceedings related to his federal criminal charges. Doc. 183. On April 8, 2013, O'Malley again supplemented his motion, raising a sixth claim, that the United States improperly rewarded Pinski for breaching his cooperation agreement. Doc. 186; see also Docs. 188, 190.
>
> On June 17, 2013, O'Malley, with the assistance of counsel, filed a motion to stay the proceedings on his Rule 33 motion while counsel investigated whether new

8

evidence existed that would warrant a new trial. Doc. 195. On June 19, 2013, the
Court issued an opinion denying the motion to stay and advising O'Malley that
his Rule 33 motion would be treated as a motion under 28 U.S.C. § 2255. Doc.
196. O'Malley withdrew that motion, but after his counsel withdrew from the
case, he filed another *pro se* motion (Doc. 209) for new trial under Rule 33 on
March 31, 2014, shortly after the Seventh Circuit issued the mandate in his direct
appeal. See Doc. 207. In an opinion issued on May 28, 2014, the Court denied
O'Malley's motion as it related to his third claim and construed his first and
second claims as a motion under § 2255. Doc. 216. O'Malley appealed that
decision and the subsequent denial of his motion to reconsider on August 1, 2014.
Doc. 224.

On September 22, 2016, the Seventh Circuit issued a mandate vacating the
Court's ruling and allowing O'Malley to proceed under Rule 33. *United States v.
O'Malley*, No. 14-2711 (7th Cir. 2016).

Doc. 294, at 2–3. The Court's decision to grant O'Malley's request for counsel was based on

timing:

> Whether O'Malley is entitled to appointment of counsel to assist him in his Rule
> 33 motion depends on whether that motion was filed before his direct appeal was
> decided. The order from which O'Malley appealed was this Court's denial of his
> March 31, 2014 motion for new trial, (Doc. 209), which was filed shortly after his
> direct appeal was decided. Doc. 207. Thus, a strict technical reading of the docket
> suggests that O'Malley's Rule 33 motion came too late, and the right to counsel
> no longer applies. See *Kitchen*, 227 F.3d at 1018 ("[O]nce the direct appeal has
> been decided, the right to counsel no longer applies.").
>
> However, O'Malley's prior Rule 33 motion, (Doc. 172), was filed almost a year
> before his direct appeal had been decided. That motion contained materially
> similar allegations to his post-appeal motion, (Doc. 209), and the Court denied
> both motions for the same reason—that 28 U.S.C. § 2255, rather than Fed. R.
> Crim. P. 33, was the correct vehicle for pursuing his claims. See Docs. 196, 216.
> Ultimately, the Seventh Circuit reversed and remanded, holding that this Court
> improperly required O'Malley to bring pieces of his evidence in a separate action
> and he should have been allowed to proceed under Rule 33. (Doc. 260). In other
> words, while the motion that was the subject of the appeal was indeed filed after
> O'Malley's direct appeal was decided, that motion was precipitated because his
> prior motion was denied in error. See, e.g., *Kitchen*, 227 F.3d at 1019 ("[B]ecause
> Kitchen's motion for a new trial was decided before our decision in his direct
> appeal … [he] had a right to counsel in prosecuting such a motion and in taking
> an appeal from its denial."). Thus, the Court finds that O'Malley is entitled to
> counsel to assist him in his Rule 33 motion, and appoints the Federal Defender's
> Office to represent him.

9

Doc. 294, at 5–6.

O'Malley's counsel filed the renewed motion for new trial on November 30, 2017. Doc. 304. However, O'Malley continued to submit pro se filings, which the Court struck. See Dec. 18, 2017 Minute Entry. On January 2, 2018, O'Malley filed a motion seeking to terminate appointed counsel. Doc. 310. Another unsuccessful bid at an interlocutory appeal followed (see Doc. 317), while the Government responded to appointed counsel's motion for new trial. Doc. 315. On January 25, 2018, the Court held one more status conference to inquire as to whether O'Malley wished to proceed pro se, or with the assistance of appointed counsel. See Jan. 25, 2018 Minute Entry. He elected to proceed pro se. The Court informed O'Malley that the Court's decision on his motion for new trial would be limited to the motion (Doc. 209) and memorandum (Doc. 210) that was the subject of the appeal in *United States v. O'Malley*, 833 F.3d 810 (7th Cir. 2016), as well as now-former counsel's rendition of that motion (Doc. 304), and the respective responses and replies. O'Malley filed a final reply to the Government's response to appointed counsel's motion for new trial (Doc. 327), along with seven other motions that he was not given leave to file. See Docs. 321–26, 328. This matter is ready for resolution, and this order follows.

**LEGAL STANDARD**

Under Rule 33(b)(1) of the Federal Rules of Criminal Procedure, "the 'interest of justice' requires a new trial if additional evidence (1) was discovered after trial, (2) could not have been discovered sooner through the exercise of due diligence, (3) is material and not merely impeaching or cumulative, and (4) probably would have led to acquittal." *O'Malley*, 833 F.3d at 813 (citing *United States v. Westmoreland*, 712 F.3d 1066, 1072 (7th Cir. 2013); *United States v. Hagler*, 700 F.3d 1091, 1101 (7th Cir. 2012); *United States v. Reyes*, 542 F.3d 588, 595 (7th Cir. 2008)).

Where a motion for new trial is based on allegedly false testimony, courts conduct a "more focused" analysis, considering whether:

(a) [t]he court is reasonably well satisfied that the testimony given by a material witness is false[;]
(b) [t]he jury might have reached a different conclusion absent the false testimony or if it had known that testimony by a material witness was false [; and]
(c) [t]he party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*United States v. Bender*, 539 F.3d 449, 456 (7th Cir. 2008) (quoting *United States v. Van Daal Wyk*, 840 F.2d 494, 500 (7th Cir. 1988)).

## DISCUSSION

In his motion for new trial (Doc. 209), and memorandum in support (Doc. 210), O'Malley alleged that he had obtained new evidence that discredited Pinski, who he asserts was critical to establishing that O'Malley knew the insulation was asbestos. He separated the new evidence into three categories: "(1) information withheld from him at the time of trial about Pinski's ongoing cooperation with federal authorities investigating Pinski's involvement in organized crime; (2) correspondence and agreements between Pinski and the Illinois EPA, which, O'Malley says, demonstrate that Pinski steered him to violate the Clean Air Act unintentionally; and (3) an appraisal of Pinski's property done after the asbestos removal that, O'Malley asserts, contradicts Pinski's trial testimony." *O'Malley*, 833 F.3d at 812. The Court previously denied O'Malley's third claim, finding that evidence of the appraisal would have been merely impeaching or cumulative, and thus not likely to lead to an acquittal. Following the Seventh Circuit's decision remanding the case for consideration of all the claims in O'Malley's motion, this Court must decide whether the interests of justice require a new trial.

*(1) Pinski's Cooperation*

O'Malley argues that the Government suppressed information regarding Pinski's cooperation in *United States v. Jimmy LaCost*, No. 10-20001 (C.D. Ill. 2012). Doc. 210, at 12; Doc. 304, at 6. According to O'Malley, "the Government never disclosed Mr. Pinski's criminal conduct in money laundering and tax avoidance to Defendant O'Malley's defense and jury, despite their full knowledge. Nor did the Government disclose 302 interview reports of Mr. Pinski, the Government cooperation agreement associated thereto, nor any indicia whatsoever of the ongoing criminal investigation." Doc. 210, at 12. However, O'Malley then acknowledges in a footnote that Pinski's plea agreement was disclosed to the defense and admitted at trial, and Pinski testified as to his cooperation agreement at trial. Doc. 210, at 12 n. 4. Indeed, Pinski was cross-examined on the plea and cooperation agreements and admitted that he hoped to receive a more lenient sentence from the Court as the result of his testimony and cooperation. Doc. 86, at 54. As this Court has already found, additional evidence of Pinski's cooperation would have been immaterial to O'Malley's guilt:

> Even assuming arguendo that the documents in question could not have been discovered sooner through the exercise of due diligence, Defendant cannot show this evidence would be material as opposed to merely impeaching or cumulative, and he certainly cannot show it would probably lead to an acquittal in the event of a retrial. As Defendant concedes, evidence of Pinski's cooperation agreement and plea agreement with the government was revealed to the jury. Further, Pinski was extensively questioned as to his veracity on cross-examination by Defendant's counsel. Therefore, the court believes that Defendant's proffered evidence would not be material, but rather would be cumulative evidence offered for impeachment purposes. Further, Defendant's evidence would probably not lead to an acquittal in the event of a retrial. The main question for the jury was whether Defendant knew that the material in question was regulated asbestos-containing material. Contrary to what Defendant argues in his motion, Pinski was not the only witness who testified that Defendant knew he was removing asbestos. As noted by the Seventh Circuit, James Mikrut (one of Defendant's employees), Virgil Lietz (another of Defendant's employees), Richard Folk (considered by Defendant for the removal job), and Jeff Franc (hired by Defendant for the removal job) all testified that Defendant knew of asbestos in the building, whether through what

12

> they told Defendant or what Defendant told them. *O'Malley*, 739 F.3d at 1003-04. Therefore, the jury was presented with testimony from various witnesses, aside from Pinski, that showed Defendant knew of asbestos material in the insulation to be removed and that he did not properly notify the federal EPA or IEPA. Thus, Defendant's new evidence would not likely result in an acquittal in the event of a new trial, and his Rule 33 motion must be denied on this ground. See *Westmoreland*, 712 F.3d at 1072.

Doc. 216, at 5–6. In sum, O'Malley's newly discovered evidence regarding Pinski's cooperation was immaterial, "merely impeaching or cumulative," and would not have probably led to an acquittal. *United States v. Westmoreland*, 712 F.3d 1066, 1072 (7th Cir. 2013).

*(2) Correspondence and Agreements Between Pinski and the Illinois EPA*

O'Malley also asserts that evidence he discovered after trial of correspondence and agreements between Pinski and the Illinois EPA demonstrates that Pinski steered him to violate the Clean Air Act unintentionally. Doc. 210, at 17. Specifically, O'Malley argues that pleadings and correspondence arising out of civil litigation commenced by the Illinois Attorney General against Dearborn Management (Pinski's company) and the State Bank of Herscher show that Pinski, through his attorney, made numerous misrepresentations. *Id*. at 17–22. Yet O'Malley acknowledges that "these filings are public record." *Id*. at 18. And he does not explain why the letter he relies on and admits is a public record, dated a month before O'Malley's indictment, "could not have been discovered sooner through the exercise of due diligence." *Westmoreland*, 712 F.3d at 1072.

O'Malley also fails to explain how correspondence in a civil action between Pinski's attorney and the Illinois EPA was in the possession of the federal prosecutor for the purposes of *Brady*. It is true that "[t]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995); see also *United States ex rel. Smith v. Fairman*, 769 F.2d

386, 391 (7th Cir. 1985) (*Brady* rule violated where police, rather than prosecutors, were responsible for suppression of exculpatory information). However, "neither *Kyles* nor *Fairman* can be read as imposing a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue." *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996). In sum, the United States could not have violated *Brady* by not turning over public documents that it did not possess regarding correspondence between Pinski and the Illinois EPA.

*(3) A New Trial is not Warranted*

Having discussed the three categories of additional evidence separately, the Court now considers as a whole all the additional evidence O'Malley relies on in his motion. Even if O'Malley could show that the additional evidence "(1) was discovered after trial, (2) could not have been discovered sooner through the exercise of due diligence, [and] (3) is material and not merely impeaching or cumulative," he cannot establish that the additional evidence "(4) probably would have led to acquittal." *O'Malley*, 833 F.3d at 813 (citing *Westmoreland*, 712 F.3d at 1072. This is not the case where the Government's case rests "entirely on the uncorroborated testimony of a single witness." Cf. *United States v. Salem*, 578 F.3d 682, 688 (7th Cir. 2009). Rather, as the Government outlines in its response, Pinksi was but one of many witnesses who testified to O'Malley's knowledge of the presence of asbestos insulation. Doc. 315, at 18.

> Completely independent of Pinski's testimony, the trial evidence established that one of Pinski's employees, James Schultz, overheard a conversation between Pinski and O'Malley, in which O'Malley referred to the "old water pipes with asbestos," and recommended that Pinski "[m]ight as well get rid of them." (R.86, pp.89-90) O'Malley told his employee and co-defendant, James Mikrut, that Origin Fire Protection had agreed to remove pipe insulation from the West Avenue building. (R.85, p.31) When Mikrut walked through the building with O'Malley, Mikrut told O'Malley, "This is probably all asbestos in this building." (R.85, pp.32-33) O'Malley later told Mikrut that Origin Fire Protection needed the extra money from the insulation removal job for payroll and that the payments from

14

Pinski should be in cash because that way, "there wouldn't [be] a paper trail." (R.85, pp.33-34) This testimony was corroborated by documentary evidence consisting of checks from Pinski's company, Dearborn Management, made out to cash. (R.86, pp.36-39, Gov.Ex. 11A, 11B)

O'Malley offered to pay another Origin Fire Protection employee, Virgil Lietz, to help remove insulation from the West Avenue building. (R.86, pp.97-98, 102) When he offered Lietz this additional work, O'Malley told Lietz that the insulation which had to be removed might contain asbestos. (R.86, p.98) Lietz declined the offer after Mikrut cautioned him that he should avoid working with asbestos. (R.86, p.98)

Origin Fire Protection then approached Richard Folk about the insulation removal job. (R.85, p.137) Folk walked through the West Avenue building and recognized the pipe insulation as containing asbestos. (R.85, p.138) Folk told O'Malley that a person needed a license to remove asbestos insulation; although Folk did not have such a license, O'Malley asked him to do the work. (R.85, pp.139-40) Folk requested $10,000 and protective equipment to remove the asbestos insulation from the West Avenue building. (R.85, pp.139-40) O'Malley did not hire Folk, however, and hired Jeff Franc to remove the asbestos for around $4,000. (R.85, pp.192-94)

O'Malley was present during the loading of the bags of asbestos debris and ordered the workers to "Hurry up." (R.85, pp.46-48) Later, O'Malley directed another Origin Fire Protection employee, Steven Giles, to transport the bags to an asbestos abatement company called Angel Abatement. (R.85, pp.44-47, 49, 51-52; R.86, 170; Gov. Ex. 8) Angel Abatement refused to accept the large load of asbestos waste, and Giles drove the bags of asbestos debris back to the Origin Fire Protection facility. (R.85, pp.207-08; R.86, p.170; Gov.Ex. 8)

After the truck returned, O'Malley asked Franc to take some of the bags and dispose of them at an abandoned farmhouse a couple of miles from O'Malley's property. (R.85, pp.209-10) O'Malley never asked Franc to take the bags of asbestos debris to a waste disposal site operated in accordance with U.S. EPA regulations. (R.85, p.211) O'Malley also asked Lietz to dispose of some of the full garbage bags, which Lietz placed in a dumpster where a Hobby Lobby store was located. (R.86, pp.99-102)

O'Malley later asked Franc to dispose of the remaining bags of asbestos debris, but did not ask where the bags would be dumped. (R.85, pp.52-53, 210-11) As O'Malley would later admit to agents of the U.S. EPA's Criminal Investigation Division, he did not want to know where the bags would be dumped. (R.86, p.162) Likewise, O'Malley instructed Mikrut to take the bags of asbestos in the Origin Fire Protection truck and get rid of them; Mikrut and Franc drove the truck to a field in Hopkins Park, Illinois, where they dumped the bags of asbestos debris at the end of a road, near a vacant house. (R.85, pp.53-55, 211-13)

15

> During the later investigation into the illegal dumping, O'Malley told Mikrut to go to the building and meet with EPA Inspector Kotas. (R.85, p.57) O'Malley instructed Mikrut that, if Inspector Kotas asked about the insulation that had been removed from the building, Mikrut should deny removing the insulation from the pipes and say, "all I did was alarm work." (R.85, pp.57-58) Mikrut complied and falsely claimed to Inspector Kotas that "we took no insulation off of the pipes." (R.85, 57-58)
>
> Later, law enforcement agents from the U.S. EPA's Criminal Investigation Division interviewed Mikrut. (R.86, p.140) During this interview, Mikrut admitted that Origin Fire Protection had removed and dumped the asbestos insulation, and agreed to make recorded telephone calls to O'Malley. (R.85, pp.58-59; R.86, pp.139-40) During these calls, O'Malley coached Mikrut to mislead federal agents if asked about the asbestos removal and disposal. (R.86, pp.163-66; Gov.Ex. 2A, 2B) O'Malley also concocted a story that he urged Mikrut to repeat to the agents, in which he blamed the illegal asbestos removal on Jeff Franc. (Gov.Ex. 2A, 2B) At one point during the conversation, however, O'Malley stated, "I mean I wouldn't say anything. I would say we didn't take any of that stuff out of there and leave it at that and see what happens at that point. If you start saying … we took the stuff out then all of a sudden we've got, … we got problems." (Gov.Ex. 2B, pp.5-6) Later, when Mikrut suggested, "… maybe we should just uh, tell them [federal agents] the truth," O'Malley responded, "Tell them what, we took it [the asbestos pipe insulation] out?" (Gov.Ex. 2B, pp.5-6)
>
> When the EPA agents later interviewed O'Malley, he at first denied his involvement in the asbestos removal and dumping activities. (R.86, p.165; Gov.Ex. 2A, 2B) When confronted by the agents, O'Malley admitted in a verbal and written statement that he had failed to stop the illegal asbestos removal even after he suspected the material was asbestos. (R.86, pp.158-62, 168-71; Gov.Ex. 2A, 2B) O'Malley confessed that he had paid Franc $500 to dispose of the asbestos waste and that he had instructed employees to "stretch the truth" if questioned by law enforcement about the asbestos removal job. (R.86, pp.160-62)

Doc. 315, at 18–22.

The overwhelming evidence at trial established O'Malley's guilt and none of O'Malley's additional evidence—together or separately—would have altered the jury's determination. Accordingly, O'Malley's Motion for New Trial (Doc. 209) and Motion for New Trial and Evidentiary Hearing (Doc. 304) are denied, and all other pending motions are denied as moot.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for New Trial (Doc. 209) is DENIED, Defendant's Motion for New Trial and Evidentiary Hearing (Doc. 304) is DENIED, and all other pending motions are DENIED AS MOOT.

Signed on this 6th day of March, 2018.

<u>s/ James E. Shadid</u>
James E. Shadid
Chief United States District Judge